IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

DONNA PRATHER,

       Plaintiff,                 No. 2:08-cv-01476 KJN

     v.                     ORDER

MICHAEL J. ASTRUE,
Commissioner of Social Security,

       Defendant.

_____/

        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "defendant") denying plaintiff's application for Disability Insurance Benefits under Titles II and XVI of the Social Security Act ("Act").  In her motion for summary judgment, plaintiff principally contends that the Administrative Law Judge ("ALJ") erred by:  (1) rejecting the opinion of plaintiff's treating physician without a legitimate basis for doing so; (2) failing to credit plaintiff's testimony and third party statements regarding the nature and extent of plaintiff's functional limitations; and (3) failing to secure the testimony of a vocational expert.  (Dkt. No. 19.)  The Commissioner filed a cross-motion for summary judgment.  (Dkt. No. 20.)

        For the reasons stated below, the court denies plaintiff's motion for summary

judgment and grants the Commissioner's cross-motion for summary judgment.[1]

I.    BACKGROUND

    A.    Procedural Background

        On September 6, 2005, plaintiff filed a Title II and Title XVI application for a period of disability and disability insurance, alleging a disability onset date of March 31, 2003. (Administrative Transcript ("AT") 14, 69-76.)  The Social Security Administration denied plaintiff's application initially and upon reconsideration.  (AT 14, 43-48, 50-54.)  Plaintiff filed a timely request for a hearing, and the ALJ conducted a hearing on May 8, 2006.  (AT 542-65.) Plaintiff, who was represented by counsel, was the only person to testify at the hearing.  (AT 14.)

        In a decision dated January 23, 2008, the ALJ denied plaintiff's application.  (AT 11-23.)  The ALJ found that plaintiff had the residual functional capacity to perform certain simple, unskilled medium work and therefore was not under a disability within the meaning of the Social Security Act.[2]  (See AT 14, 18-23.)  The ALJ's decision became the final decision of

---

[1]  This case was referred to the undersigned pursuant to Eastern District of California Local Rule 302(c)(15) and 28 U.S.C. § 636(c), and both parties voluntarily consented to proceed before a United States Magistrate Judge.  (Dkt. Nos. 7, 10.)  This case was reassigned to the undersigned by an order entered February 9, 2010.  (Dkt. No. 21.)

[2]  Disability Insurance Benefits are paid to disabled persons who have contributed to the Social Security program, 42 U.S.C. §§ 401 et seq.  Generally speaking, Supplemental Security Income ("SSI") is paid to disabled persons with low income.  42 U.S.C. §§ 1382 et seq.  Under both benefit structures, the term "disability" is defined, in part, as an "inability to engage in any substantial gainful activity" due to "any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). A five-step sequential evaluation governs eligibility for benefits.  See 20 C.F.R. §§ 404.1520, 404.1571-1576, 416.920, 416.971-976; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987). The Ninth Circuit Court of Appeals has summarized the sequential evaluation as follows:

> Step one:  Is the claimant engaging in substantial gainful activity?  If so, the claimant is found not disabled.  If not, proceed to step two.
> Step two:  Does the claimant have a "severe" impairment? If so, proceed to step three.  If not, then a finding of not disabled is appropriate.
> Step three:  Does the claimant's impairment or combination

1   the Commissioner when the Appeals Council denied plaintiff's request for review.  (AT 6-8.)

2        B.    Summary of Relevant Medical History and Evidence

3            At the time of her hearing before the ALJ, plaintiff was 43 years old.  (AT 544.)

4   She had worked as a CNA[3] at a hospital, as a sales associate at a clothing store, and as an

5   assistant manager at a home decorations store.  (See AT 546.)  Plaintiff stopped working on

6   March 31, 2003, because of her kidney stones.  (AT 546.)

7            Plaintiff experienced several severe kidney stones in the 1990s, although her

8   kidney stone issues appear to have lessened significantly since the alleged date of onset.  (AT

9   186.)  Plaintiff sought medical care at emergency rooms at least five times between August 2002

10  and April 2004 for complaints about kidney stones and pain.  (AT 354-77.)  In October 2004,

11  plaintiff visited her physician, Dr. Nirpal Mehton, for pain related to the kidney stones.  (AT 316-

12  22.)  Dr. Mehton prescribed plaintiff morphine and ibuprofen and stated that plaintiff's pain was

13  "well controlled."  (AT 316.)

14           On February 2, 2005, Dr. Mehton decided to take plaintiff off of her narcotic

15  medications after she exhibited withdrawal symptoms.  (AT 308.)   Plaintiff began shaking

16

17           of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
             404, Subpt. P, App.1?  If so, the claimant is automatically
18           determined disabled.  If not, proceed to step four.
                  Step four:  Is the claimant capable of performing his past
19           work?  If so, the claimant is not disabled.  If not, proceed to step
             five.
20                Step five:  Does the claimant have the residual functional
             capacity to perform any other work?  If so, the claimant is not
21           disabled.  If not, the claimant is disabled.

22  Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).

23       The claimant bears the burden of proof in the first four steps of the sequential evaluation
    process.  Bowen, 482 U.S. at 146 n.5.  The Commissioner bears the burden if the sequential
24  evaluation process proceeds to step five.  Id.

25       [3]  Although plaintiff did not define this term in her Disability Report, she describes her
    job duties in this position as "cared for patients" and "bed checks of patients."  Presumably the
26  term CNA refers to "Certified Nursing Assistant."  (AT 70.)

3

1  uncontrollably at this doctor's visit.  (Id.).  Upon questioning by Dr. Mehton's office, plaintiff

2  explained that she "ran out of" her narcotic pain medication five days prior to her visit.  (AT

3  308.)  At a follow up visit two days later for her medication issues, plaintiff's medical records

4  reveal that she claimed that her "roommate" had taken some of her medications.  (AT 306.)  Dr.

5  Mehton's office concluded that plaintiff was experiencing narcotic withdrawal and chronic pain

6  syndrome.  (AT 306-09, 312.)  Plaintiff informed Dr. Mehton's office that she had been using

7  narcotics for over two years, and the physician's office explained that they would taper her off of

8  narcotics and would not be refilling her narcotic medications.  (AT 306-09.)

9          Two days later, on February 6, 2005, plaintiff visited the Shasta Regional Medical

10  Center Emergency Department for "withdrawal symptoms, tremor and seizure."  (AT 351.)  The

11  emergency room treating physician's report states that plaintiff had no prior history of seizures,

12  but that she "was shaking so violently at home that she wet her pants," and that she was

13  "anxious, actively vomiting in moderate to severe distress."  (Id.)  The emergency room report

14  also states that plaintiff was taking a high dose of narcotics, but was taken off of those narcotics

15  by Dr. Mehton.  (AT 351.)  The emergency room attempted to find a "detox" location for

16  plaintiff but was unsuccessful.  (AT 352.)  Plaintiff was discharged and given instructions on her

17  withdrawal symptoms, including the fact that she would continue to have shaking episodes.[4]  (AT

18  353.)

19          On February 10, 2005, plaintiff visited Dr. Mehton's office and discussed her

20  "seizures" and shaking.  (AT 304.)  Dr. Mehton's office found that plaintiff was suffering from

21  narcotic withdrawal.  (Id.)  On February 25, 2005, plaintiff went to the Shasta Regional Medical

22  Center Emergency Department for "shaking and tremors."  (AT 347.)  Dr. Andrew Knapp, the

23  physician who treated plaintiff at that time, diagnosed plaintiff with "acute opiate withdrawal."

24  _____

25          [4]  Over the next few months, plaintiff continued to visit a variety of medical professionals
   regarding her shaking and seizure-like activity and other withdrawal symptoms.  (AT 300, 347,
26  351).

4

1    (AT 349.)

2           On March 1, 2005, plaintiff experienced stroke-like symptoms, including falling

3    to the right and inability to walk, and was admitted to Mercy Medical Center for nine days to

4    "rule out basal ganglia stroke." (AT 206-09.) An EEG was performed and was insignificant for

5    seizure, and according to hospital records the reviewing physician, Dr. Gary Rowe, ruled out

6    seizure disorder. (AT 206-07.) Plaintiff's treating physician, Dr. Akua Agyeman, stated that

7    plaintiff "continued to have these tremors only when she was being observed," and that the

8    psychiatric department should be involved in the evaluation and management of plaintiff. (AT

9    207.) The hospital found no clinical evidence of seizure. (AT 207.)

10          On March 2, 2005, Dr. Rowe examined the plaintiff and concluded that her

11   movement disorder with continuous jerking and shaking of the right side was "probably

12   factitious or hysterical," and that plaintiff would need a "psychiatry consult." (AT 194.) He also

13   stated that he did not "think her prognosis [was] very good." (AT 194.)

14          On March 3, 2005, Dr. Thomas Andrews examined plaintiff and diagnosed her

15   with dysthymia[5], dependent personality traits, seizure disorder (but added the notation "rule out

16   drug withdrawal") and gave plaintiff a global assessment of functioning (GAF) score of 35.[6] (AT

17   189.) During this hospital stay, one of the nurses treating plaintiff stated that plaintiff exhibited

18   no tremors when the nurse walked in the room, but that she subsequently started shaking

19   uncontrollably. (AT 466.) This nurse suggested that hypnosis might help. (AT 466.) Plaintiff's

20   hospitalization ruled out basal ganglia stroke, and plaintiff was eventually diagnosed with

21   _____

22          [5] Dysthymia has been defined as follows: "Dysthymia, sometimes referred to as chronic
     depression, is a less severe form of depression. With dysthymia, the depression symptoms can

23   linger for a long period of time, perhaps two years or longer. Those who suffer from dysthymia
     are usually able to function adequately but might seem consistently unhappy." WebMD Medical

24   Reference, *Chronic Depression (Dysthymia)*, September 12, 2009,
     http://www.webmd.com/depression/guide/chronic-depression-dysthymia.

25          [6] A GAF score of 31-40 indicates "some impairment in reality testing or communication
     (e.g. speech is at times illogical, obscure or irrelevant) or major impairment in several areas, such

26   as work or school, family relations, judgment, thinking or mood." DSM-IV, 32.

convulsive disorder.  (AT 297.)  Plaintiff attended a follow up visit on March 14, 2005, and Dr.
Akua Agyeman stated that plaintiff "seems to be responding to redirection about the fact that this
is self-inflicted."  (AT 297.)

On May 8, 2005, plaintiff presented to the emergency room with seizure-like
symptoms.  (AT 340.)  The emergency room nurses "noted the atypical nature of her seizure
activity and [were] concerned that this might be a pseudoseizure."  (AT 340.)  At one point,
plaintiff stopped convulsing to scratch her nose.  (AT 345.)  Plaintiff became more alert at times
during discussions, and at times, when distracted, her shaking diminished.  (AT 345.)  Two
physicians examined plaintiff and concluded that she was experiencing pseudoseizures.  (AT
343.)  As defined by both parties, pseudoseizures are "paroxysmal episodes that resemble and are
often misdiagnosed as epileptic seizures; however, [they] are psychological (i.e. emotional,
stress-related) in origin."[7]

On May 26, 2005, plaintiff again went to the Shasta Regional Medical Center
Emergency Department.  (AT 335.)  The treating physician, Dr. Joanna Weinberg, diagnosed
plaintiff with pseudoseizures, mild dehydration, and anemia.  (AT 337.)  Dr. Weinberg also
stated that if plaintiff continued to have such frequent emergency room admissions which
required a "large workup for pseudoseizures, it may be helpful if a social worker would become
involved to help channel this patient's activity into a less costly venue."  (AT 338.)

On July 31, 2005, plaintiff again went to the Shasta Regional Medical Center
Emergency Department for seizure activity.  (AT 330.)  The treating physician noted that plaintiff
would stop seizing to engage in purposeful movement.  (AT 330.)  She was again diagnosed with
nonepileptic pseudoseizures, and was instructed that she should seek mental health treatment.
(AT 332.)  Dr. Lloyd Pena, her treating physician during this visit, stated that there were

---

[7] Plaintiff and defendant both cite the same website for their definition of
"pseudoseizure."  http://emedicine.medscape.com/article/1184694-overview (See Dkt. No. 19 at
1; Dkt. No. 20 at 3.)

1  "medications there that would help cure her problem," but that plaintiff "stated that she had no

2  interest in going there."  (AT 332.)

3     On September 6, 2005, plaintiff filed her disability application alleging, inter alia,

4  that her kidney stones and seizures limited her ability to work.  (AT 69-75.)  Plaintiff continued

5  to attend visits at Dr. Mehton's office.  On September 26, 2005, Dr. Mehton's office notes state

6  that plaintiff is still having tremors and seizure activity, but that plaintiff has not sought mental

7  health treatment.  (AT 272.)  Dr. Mehton's office notes also state that when nurse practitioner

8  Deb Wright walked in the room, plaintiff manifested an obvious increase in her tremors.  (AT

9  272.)

10     On November 1, 2005, Sudhir Jaituni, M.D., a state agency physician, reviewed

11  plaintiff's medical records and concluded that she could lift fifty pounds occasionally, twenty-

12  five pounds frequently, and could sit or stand for six hours in an eight hour workday.  (AT 241.)

13  Dr. Jaituni stated that plaintiff's renal function was normal, but that she should avoid heights and

14  dangerous machinery as a seizure precaution.  (AT 242-44.)  He also found that there was only

15  partial support for plaintiff's reported severity or duration of her symptoms based on her

16  medically determinable impairments.  (AT 245.)

17     On November 21, 2005, Dr. David C. Richwerger, a licensed psychologist, issued

18  a report following his psychological evaluation of plaintiff.  (AT 228-34.)  In rendering his

19  opinion, Dr. Richwerger recognized plaintiff's earlier hospital treatment, and diagnosis of

20  dysthymia, seizure disorder, and other issues.  Plaintiff denied that she had any mental or

21  emotional problems.  (AT 228.)  Dr. Richwerger found that plaintiff's IQ was 74, that she had no

22  impairment in her ability to maintain regular attendance in the workplace, that she had a

23  moderate impairment in her ability to perform work activities on a consistent basis, and that she

24  had a slight impairment in her ability to complete a normal workday or workweek without

25  interruption from a psychiatric condition.  (AT 233.)  He diagnosed plaintiff with a mild

26  cognitive disorder, expressed health and employment related concerns, and assigned plaintiff a

1    GAF score of 60.[8]  (AT 233.)

2         On January 3, 2006, Dr. Mehton's office advised plaintiff "to go to mental health -

3    seek psych eval - agrees she will do."  (AT 270.)  The office notes also state that plaintiff began

4    shaking the right side of her body when the nurse practitioner walked into the room.  (AT 270.)

5         On January 18, 2006, a state agency psychiatrist reviewed plaintiff's medical

6    records and in a Physical Residual Functional Capacity report, concluded that plaintiff "can do

7    SRTs [simple repetitive tasks] in a normal work setting and social and coworker interaction," but

8    that her pace and persistence is moderately impaired.  (AT 250.)

9         Plaintiff continued to visit Dr. Mehton's office.  In June 2006, Dr. Mehton's

10   nurse, Deb Wright, noted that plaintiff's tremors were better controlled after taking Mirapex.

11   (AT 390.)  In December, 2006, nurse Wright stated in her office notes that she saw the plaintiff

12   in town walking with her family "about a month ago," and that plaintiff showed "no disability -

13   walking normally - using both arms in conversation and while shopping."  (AT 384.)  Nurse

14   Wright also stated that plaintiff's tremor "worsens when NP [nurse practitioner] in room.  When

15   NP out of site [sic] - pt left clinic and no tremors - no sign of disability.  Walked hurriedly

16   through building."  (AT 384.)

17        On September 12, 2007, approximately nine months later, Dr. Mehton submitted a

18   Physical Residual Functional Capacity Questionnaire in support of plaintiff's disability

19   application.  (AT 531-33.)  Dr. Mehton stated that plaintiff's diagnoses were "epilepsy or

20   pseudoseizures, chronic anemia, chronic renal stones, PTSD, right hemianopsia and right-sided

21   tremors and weakness which is partially controlled with medications."  (AT 531.)  Dr. Mehton's

22   report stated that plaintiff experienced seizures two to three times per month which lasted three

23   to twelve minutes per seizure, with a post-seizure state lasting two to three hours, and that

24

25        [8]  A GAF score of 51-60 indicates "moderate symptoms (e.g., flat affect and
     circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or
26   school functioning (e.g. few friends, conflicts with peers or coworkers)."  DSM-IV, 32.

8

1    plaintiff has urinated on herself during seizures and has had head injuries from falls.  (AT 531.)

2    He stated that plaintiff had no functional use of her right hand.  (AT 533.)  During a typical eight

3    hour workday, Dr. Mehton stated that plaintiff could sit about two hours, stand about two hours,

4    walk approximately 10 minutes, lift less than ten pounds on an occasional basis, that she needed

5    the opportunity to shift at will from sitting or standing/walking, and that she would need to lie

6    down for four hours during a typical eight hour work day.  (AT 531-32.)

7           On September 17, 2007, plaintiff testified at her disability hearing held before

8    ALJ Mark C. Ramsey.  (AT 544.)  Plaintiff testified that she had worked at a retail outlet prior to

9    her date of onset, but that she stopped working because of her kidney stones.  (AT 546-47.)

10   Plaintiff also testified that at home, she changed her bedsheets, did laundry, vacuumed, and

11   cooked meals.  (AT 547-48.)  She stated that she would ride a stationary bike for fifteen minutes,

12   and that she would crochet and do bead work for a hobby.  (AT 549.)  Plaintiff testified that she

13   had tremors in her right hand, but that they were controlled with Mirapex.  (AT 556.)  She

14   clarified that her medication "just helps" her tremors, but that it does not eliminate them

15   altogether.  (Id.)  Plaintiff stated that she was having between two and five seizures a month, but

16   that she no longer went to the hospital when she had one because "I don't like what they say

17   when I get to the hospital."  (AT 558.)  Plaintiff testified that she usually takes a nap during the

18   day "about an hour, hour and a half."  AT 562.  The ALJ took the matter under submission and

19   subsequently issued a written decision.[9]

20          C.    Summary of the ALJ's Findings

21          The ALJ conducted the required five-step evaluation and concluded that plaintiff

22   was not disabled within the meaning of the Act.  The ALJ concluded that plaintiff met the

23   _____

24          [9]  At the conclusion of the hearing, the ALJ challenged plaintiff's earlier testimony that
     she did not use street drugs, stating that plaintiff had told a psychiatrist that she used
25   methamphetamine daily for eight years, and had quit eight years ago.  (AT 563.)  Plaintiff stated
     or clarified that she had used methamphetamine, but that she had stopped 10 or 11 years ago.
26   (AT 564.)

1  insured status requirements of the Social Security Act through March 31, 2007.  (AT 16.)  At

2  step one, the ALJ concluded that plaintiff had not engaged in substantial gainful activity since

3  March 31, 2003, the alleged date of onset.  (AT 16.)  At step two, the ALJ concluded that

4  plaintiff had the following severe impairments: "seizure disorder, kidney stones and dysthymia."

5  (AT 16.)  At step three, he determined that plaintiff's impairments, whether alone or in

6  combination, did not meet or medically equal any impairment listed in the applicable regulations.

7  (AT 16.)  The ALJ further determined that plaintiff had the residual functional capacity ("RFC")

8  to perform medium work that does not require working at heights or around dangerous

9  machinery.  (AT 18.)  The ALJ found, at step four, that plaintiff was unable to perform any past

10  relevant work, because that work was skilled work.  (AT 22.)  Finally, the ALJ found, at step

11  five, that there are jobs that exist in significant numbers in the national economy that the

12  claimant could perform, considering her age, education, work experience, and RFC.  (AT 22.)

13  II.    ISSUES PRESENTED

14          Plaintiff contends that the ALJ committed errors in reviewing plaintiff's claim.

15  First, plaintiff argues that the ALJ erred by rejecting the opinion of Dr. Mehton, a treating

16  physician, without providing "specific and legitimate" reasons for doing so.  (Pl.'s Mot. for

17  Summ. J. at 18.)  Second, she argues that the ALJ failed to credit her testimony regarding the

18  nature and extent of her functional limitations.  (Id. at 21.)  Third, she contends that the ALJ

19  "failed to reference, much less discuss," corroborating statements of her lay witnesses.  (Id. at

20  24.)  Fourth, she argues that the ALJ should not have relied solely on the Commissioner's

21  Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2 (the "GRIDS") to determine

22  the availability of other jobs because the GRIDS do not accurately describe plaintiff's limitations.

23  (Id. at 27.)  Finally, plaintiff argues that the ALJ erred by not using the services of a vocational

24  expert where the "medical evidence suggests that a claimant's impairments may amount to a

25  nonexertional impairment."  (Id. at 27-28.)

26  ////

1    III.    STANDARDS OF REVIEW

2           The court reviews the Commissioner's decision to determine whether it is (1) free

3    of legal error, and (2) supported by substantial evidence in the record as a whole.  Bruce v.

4    Astrue, 557 F.3d 1113, 1115 (9th Cir. 2009); accord Vernoff v. Astrue, 568 F.3d 1102, 1105 (9th

5    Cir. 2009).  This standard of review has been described as "highly deferential."  Valentine v.

6    Comm'r of Soc. Sec. Admin., 574 F.3d 685, 690 (9th Cir. 2009).  "Substantial evidence means

7    more than a mere scintilla but less than a preponderance; it is such relevant evidence as a

8    reasonable mind might accept as adequate to support a conclusion."  Bray v. Comm'r of Soc.

9    Sec. Admin., 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting Andrews v. Shalala, 53 F.3d 1035,

10   1039 (9th Cir. 1995)); accord Valentine, 574 F.3d at 690 (citing Desrosiers v. Sec'y of Health &

11   Human Servs., 846 F.2d 573, 576 (9th Cir. 1988)).  "The ALJ is responsible for determining

12   credibility, resolving conflicts in medical testimony, and for resolving ambiguities."  Andrews,

13   53 F.3d at 1039; see also Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th Cir. 2008) ("[T]he

14   ALJ is the final arbiter with respect to resolving ambiguities in the medical evidence.").  Findings

15   of fact that are supported by substantial evidence are conclusive.  42 U.S.C. § 405(g); see also

16   McCarthy v. Apfel, 221 F.3d 1119, 1125 (9th Cir. 2000).  "Where the evidence as a whole can

17   support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's."

18   Bray, 554 F.3d at 1222 (citing Massachi v. Astrue, 486 F.3d 1149, 1152 (9th Cir. 2007)); see also

19   Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("'Where evidence is

20   susceptible to more than one rational interpretation,' the ALJ's decision should be upheld.")

21   (quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005)).  However, the court "must

22   consider the entire record as a whole and may not affirm simply by isolating a 'specific quantum

23   of supporting evidence.'"  Ryan, 528 F.3d at 1198 (quoting Robbins v. Soc. Sec. Admin., 466

24   F.3d 880, 882 (9th Cir. 2006)); accord Lingenfelter v. Astrue, 504 F.3d 1028, 1035 (9th Cir.

25   2007).

26   ////

IV.     ANALYSIS

      A.     <u>The ALJ Provided Specific and Legitimate Reasons for Not Adopting Dr.
         Mehton's Medical Opinion Regarding Plaintiff's Limitations.</u>

      Plaintiff's primary contention is that the ALJ erred by discounting or rejecting Dr. Mehton's medical opinion regarding plaintiff's functional limitations without articulating "specific and legitimate" reasons for doing so.  (Pl.'s Mot. for Summ. J. at 18-21.)  The Commissioner argues that the ALJ properly rejected Dr. Mehton's opinion by providing specific and legitimate reasons that are supported by substantial evidence in the record.  (Def.'s Opp'n & Cross-Motion for Summ. J. at 7-11.)

      The medical opinions of three types of medical sources are recognized in social security cases: "(1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither examine nor treat the claimant (nonexamining physicians)."  <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1996). Generally, a treating physician's opinion should be accorded more weight than opinions of doctors who did not treat the claimant, and an examining physician's opinion is entitled to greater weight than a non-examining physician's opinion.  <u>Id</u>.  Where a treating or examining physician's opinion is uncontradicted by another doctor, the Commissioner must provide "clear and convincing" reasons for rejecting the treating physician's ultimate conclusions.  <u>Id</u>.  If the treating or examining doctor's medical opinion is contradicted by another doctor, the Commissioner must provide "specific and legitimate" reasons for rejecting that medical opinion, and those reasons must be supported by substantial evidence in the record.  <u>Id</u>. at 830-31; <u>accord Valentine</u>, 574 F.3d at 692.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict.  <u>Andrews</u>, 53 F.3d at 1041 (citing <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir. 1989)).  In any event, the ALJ need not give weight to conclusory opinions supported by minimal clinical findings.  <u>Meanel v.</u>

1 Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999) (treating physician's conclusory, minimally

2 supported opinion rejected); see also Magallanes, 881 F.2d at 751.

3          Here, Dr. Mehton was one of plaintiff's treating physicians, and his medical

4 opinion regarding plaintiff's functional limitations was contradicted by other medical opinions in

5 the record.  (See AT 19-22.)  As a result, the ALJ was required to articulate specific and

6 legitimate reasons for rejecting Dr. Mehton's opinion.  Broadly stated, the ALJ found that the

7 record was "devoid [of] any objective findings which support [Dr. Mehton's] extreme

8 assessment, including this physician's office notes. . . ."  (AT 19.)

9          The ALJ reasoned that although the record revealed a history of abdominal pain,

10 plaintiff's treating physicians' reports suggested that her pain was not related to kidney stones

11 and that her diagnostic testing was "essentially normal."  (AT 18.)  The ALJ reached a similar

12 conclusion with regard to plaintiff's seizures.  He noted that the record revealed that plaintiff's

13 diagnostic testing was normal and that plaintiff's seizures were defined by a treating physician as

14 non-epileptic in nature.  (AT 18.)  See Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190,

15 1195 (9th Cir. 2004) (holding that an ALJ may discredit a treating physician's opinion that is

16 unsupported by medical findings).  The ALJ also discussed plaintiff's lack of interest in further

17 or more helpful treatment for her conditions.  He noted that she stated that she did not wish to

18 participate in treatment for kidney stones and that she stated that she would "deal with it."  (AT

19 19.)  Plaintiff denied any mental or emotional problems when examined by a psychologist, and

20 did not receive ongoing treatment for psychological disorders.  (AT 19.)

21          Moreover, the ALJ cited numerous instances of conduct by plaintiff consistent

22 with his conclusion that the claimant had sufficient residual functional capacity to perform

23 medium work.  In support, he noted that plaintiff's "'shaking' diminished when distracted," that

24 plaintiff commenced "shaking" when the nurse practitioner entered the room," and that plaintiff's

25 "tremors" worsened when an examiner entered the room and stopped when the nurse was out of

26 sight.  (AT 18-19.)  The ALJ also cited to records from Dr. Mehton's office, which stated that

1    plaintiff was observed walking hurriedly "without difficulty," and shopping in town "without
2    difficulty."  (AT 19.)

3            Again, the undersigned's task is not to re-weigh the evidence in the record; it is to
4    determine whether the ALJ's decision is supported by substantial evidence and free of legal error.
5    Here, the ALJ recognized the record's lack of support for Dr. Mehton's extreme assessment,
6    cited medical evidence that contradicted Dr. Mehton's report, and offered his own interpretation
7    of the evidence as a whole.  (AT 18-22.)  See Reddick v. Chater, 157 F.3d 715, 725 (9th Cir.
8    1998) (recognizing that an ALJ's rejection of a treating physician's conclusion is proper where it
9    was inconsistent with that physician's own clinical notes).  An ALJ is permitted to draw such an
10   inference from the record and, accordingly, the undersigned finds that this is a specific and
11   legitimate reason for discounting Dr. Mehton's opinion.  See Tommasetti, 533 F.3d at 1038
12   ("The ALJ's findings will be upheld 'if supported by inferences reasonably drawn from the
13   record . . . .'") (citing Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir.
14   2004)); Macri v. Chater, 93 F.3d 540, 544 (9th Cir. 1996) (stating that "the ALJ is entitled to
15   draw inferences 'logically flowing from the evidence'" (citation omitted)).

16           Plaintiff further contends before this court that she had a "serious psychiatric
17   disorder" and thus that there was no "objective proof of an epileptic type seizure disorder," and
18   therefore the record would not be expected to contain any objective evidence supporting Dr.
19   Mehton's extreme assessment.  (Pls. Mot. for Summ. J. at 19.)  But the ALJ did not premise his
20   finding that Dr. Mehton's opinion was entitled to minimal weight solely on the lack of objective
21   evidence of an "epileptic type seizure disorder," but rather on the above recited record as a
22   whole.  The ALJ stated that he considered all of plaintiff's symptoms, as well as the entire
23   record.  (AT 18-19.)  The ALJ specifically recognized that an examining psychologist found that
24   plaintiff's ability to perform the demands of unskilled work was intact.  (AT 19.)  Plaintiff has
25   not persuasively countered the ALJ's conclusion that Dr. Mehton's assessment and the remainder
26   of the record were contradictory.  See, e.g., Valentine, 574 F.3d at 692-93 (holding that a

                                                  14

1    contradiction between treating physician's opinion and treatment notes constitutes a specific and

2    legitimate reason for discounting that opinion); Saelee v. Chater, 94 F.3d 520, 522 (9th Cir.

3    1996) (affirming the ALJ's finding that the treating physician's report was untrustworthy because

4    it was obtained solely for the purpose of the administrative hearing, varied from the physician's

5    own treatment notes, and was worded ambiguously in an attempt to assist the claimant in

6    obtaining social security benefits).  Accordingly, the ALJ acted properly when he declined to

7    accept Dr. Mehton's assessment of plaintiff's functional limitations because substantial evidence

8    in the record supports the ALJ's finding.

9          B.      The ALJ Did Not "Fail to Credit" Plaintiff's and Lay Witness' Testimony.

10                Plaintiff contends that the ALJ erred in failing to credit her testimony and third

11   party statements regarding the nature and extent of plaintiff's functional limitations.  (Dkt. No.

12   19 at 24.)  In essence, plaintiff argues that she suffers from conditions which lack verifiable

13   objective evidence, such as pseudoseizures and chronic pain, and therefore her testimony must be

14   credited because it is or may be the only evidence of her limitations.  (Id. at 25-26 ("Indeed, the

15   absence of objective verification was part of the diagnosis of her pseudoseizure disorder;" "So

16   again, Ms. Prather experienced the pain even in the absence of actual kidney stones.").)  Plaintiff

17   also contends that there was no evidence of malingering and that the ALJ did not articulate

18   convincing reasons to discredit her testimony.

19                In evaluating whether subjective complaints are credible, the ALJ should first

20   consider objective medical evidence and then consider other factors.  Bunnell v. Sullivan, 947

21   F.2d 341, 344 (9th Cir. 1991) (en banc).  If there is objective medical evidence of an impairment,

22   the ALJ then may consider the nature of the symptoms alleged, including aggravating factors,

23   medication, treatment and functional restrictions.  See id. at 345-47.  The ALJ also may consider:

24   (1) the applicant's reputation for truthfulness, prior inconsistent statements or other inconsistent

25   testimony; (2) unexplained or inadequately explained failure to seek treatment or to follow a

26   prescribed course of treatment; and (3) the applicant's daily activities.  Smolen v. Chater, 80 F.3d

1273, 1284 (9th Cir. 1996).  Work records, physician and third party testimony about nature,

severity and effect of symptoms, and inconsistencies between testimony and conduct also may be

relevant.  Light v. Social Security Administration, 119 F.3d 789, 792 (9th Cir. 1997).  A failure

to seek treatment for an allegedly debilitating medical problem may be a valid consideration by

the ALJ in determining whether the alleged associated pain is not a significant nonexertional

impairment.  See Flaten v. Secretary of HHS, 44 F.3d 1453, 1464 (9th Cir. 1995).  The ALJ may

rely, in part, on his or her own observations, see Quang Van Han v. Bowen, 882 F.2d 1453, 1458

(9th Cir. 1989), but it cannot substitute for medical diagnosis.  Marcia v. Sullivan, 900 F.2d 172,

177 n.6 (9th Cir. 1990).  "Without affirmative evidence showing that the claimant is

malingering[10], the Commissioner's reasons for rejecting the claimant's testimony must be clear

and convincing."  Morgan v. Commissioner of Social Sec. Admin., 169 F.3d 595, 599 (9th Cir.

1999).  However, an ALJ's credibility determinations should not be reversed "based on

contradictory or ambiguous evidence."  Johnson v. Shalala, 60 F.3d 1428, 1434 (9th Cir. 1995)

(emphasis added).

Preliminarily, the court questions whether it is appropriate to accept plaintiff's

contention that the ALJ "failed to credit Ms. Prather's testimony" regarding the nature and extent

of her functional limitations.  Plaintiff argues that the ALJ "discredited Ms. Prather's testimony

regarding her seizures."  (AT 26.)  But this is not so.  The ALJ specifically recognized that

plaintiff was having seizures and then incorporated seizure limitations into her RFC.  (AT 21-23

"although the record shows that claimant experiences some seizure like activity, the record does

not show that these episodes are disabling and cannot be controlled with medication.").  It is

entirely unclear which portion of plaintiff's testimony, if any, the ALJ is charged with rejecting.

Plaintiff appears to be arguing that because plaintiff applied for disability and said she was

[10]   It is noted that although the ALJ did not make a specific finding that plaintiff was "malingering," he did recognize that the record "contained multiple references which suggest that the claimant appeared to feign the severity of her symptoms during examination."  (AT 21.)

16

1  disabled, that the ALJ should credit that "testimony," and that if he finds plaintiff not disabled,

2  he therefore must have improperly rejected the claimant's testimony.

3          Assuming, arguendo, that the ALJ in fact rejected plaintiff's testimony that she

4  was unable to work due to pain, pseudoseizures, and related difficulties, the ALJ clearly and

5  convincingly articulated his reasons in support of his finding that plaintiff was able to perform

6  work.  (AT 26.)  Here, the ALJ found that "claimant's medically determinable impairments could

7  reasonably be expected to produce the alleged symptoms, but that the claimant's statements

8  concerning the intensity, persistence and limiting effects of those symptoms [were] not entirely

9  credible."  (AT 20.)  The ALJ also noted that despite claimant's allegations of severe pain and

10  related limitations from her kidney stones, the record did not reveal that she fully complied with

11  all physician-recommended therapies or that she was receiving ongoing and regular treatments

12  for these complaints.  (AT 20-21.)  See Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004)

13  ("Failure to follow a prescribed course of remedial treatment without good reason is grounds for

14  denying an application for benefits.").  Additionally, the ALJ found that plaintiff's physical

15  examinations have been normal, and "have not reflected any neurological involvement, or muscle

16  wasting or atrophy usually associated with pain and inactivity."  (AT 21.)  The ALJ clearly stated

17  that "one would assume that if the claimant's report of her limitations was credible, then there

18  would [be] some evidence of atrophy of the arms or legs, after 4 years of inactivity."  (AT 21.)

19  Regarding her seizure activity, the ALJ found that although the record shows that the claimant

20  experiences some seizure like activity, "the record does not show that these episodes are

21  disabling and cannot be controlled with medication."  (AT 21.)  In support of this finding, the

22  ALJ referenced Social Security Ruling 87-6, which recognizes that most epileptic seizures are

23  controllable and not disabling.[11]

24  _____

25      [11]  Although not dispositive, the court notes that this same SSR mandates that where
26  seizures are alleged to be occurring at a disabling frequency, a record of anticonvulsant blood
    levels is required before a claim can be allowed.  SSR 87-6 (recognizing that situations where

1    Further, the ALJ reiterated the above-referenced evidence which supported his

2   finding that plaintiff "appear[s] to feign the severity of her symptoms during examinations." (AT

3   21.)  Contrary to plaintiff's contention, the ALJ used the lack of objective evidence in the record

4   as but one factor in his credibility determination, which included, inter alia, the claimant's

5   inadequate explanations for not seeking medical attention, physicians' observations of plaintiff's

6   behavior, and other aggravating factors.

7    Therefore, to the extent that plaintiff asserts that the ALJ made any adverse

8   credibility findings, those findings are supported by clear and convincing evidence in the record

9   and the court may not engage in "second-guessing" the ALJ's conclusions.  Thomas v. Barnhart,

10   278 F.3d 947, 958-59 (9th Cir. 2002).  The ALJ's findings are entitled to deference where, as

11   here, they are sufficiently specific to allow a reviewing court to conclude that the adjudicator

12   rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a

13   claimant's testimony.  See Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991).

14    Plaintiff further argues that the ALJ erred in failing to reference corroborating

15   statements of plaintiff's boyfriend and another friend.  (Dkt. 19 at 27.)  This contention is

16   incorrect.  Plaintiff's boyfriend submitted a written statement regarding his impressions and

17   familiarity with plaintiff's abilities, day-to-day activities and seizures.  (AT 99-106, 151-52.)

18   Plaintiff's friend submitted a statement with a witness account of plaintiff's seizures.  (AT 153.)

19   The ALJ questioned plaintiff about her boyfriend's statement at the hearing.  (AT 562-63.)  After

20   the hearing, the ALJ specifically discussed the statements from plaintiff's boyfriend and friend:

21         In arriving at this conclusion [that plaintiff has the RFC to perform
           medium unskilled work] the Administrative Law Judge recognizes
22         that the record contains statements from friends which describe the
           claimant's seizure activity (section E).  However, as stated above,
23         although the claimant may experience some seizure-like activity,
           the record does not contain any laboratory studies showing that her
24         medication levels for prolonged periods of time are therapeutic.

25   _____

26   seizures are not under good control are usually due to the individual's noncompliance with
     prescribed treatment).

1    (AT at 22.)  Plaintiff's challenge to the ALJ's ruling on the grounds that he failed to reference or

2    discuss the testimony of plaintiff's lay witnesses is without merit.

3            Plaintiff cites Stout v. Comm'r, 454 F.3d 1050, 1053 (9th Cir. 2006), for the

4    proposition that the ALJ must consider lay witness testimony concerning a claimant's ability to

5    work and that such testimony cannot be disregarded without comment.  (Dkt. No. 19 at 28.)  Yet

6    none of plaintiff's lay witnesses testified with knowledge about claimant's ability to work.  In

7    fact, plaintiff's boyfriend's statement opened by noting that he was not sure what plaintiff did all

8    day because he was at work.  (AT 99.)  Plaintiff's friend testified only as a witness to plaintiff's

9    seizures, not as to plaintiff's ability to work.  (AT 153.)  In contrast, in Stout, the lay witnesses

10   were claimant's co-workers, at least one of whom worked with the claimant for fifteen years.  Id.

11   There, the lay witness co-workers testified very specifically about claimant's ability to follow

12   direction in the workplace, and the claimant's uncommon need for supervision to perform

13   uncomplicated tasks.  Id.  The Ninth Circuit found that the ALJ erred in "wholly [fail]ing to

14   mention [the lay witnesses'] testimony about how Stout's impairments affect his ability to work."

15   Id.  This case and its reasoning is inapposite here.  Plaintiff's contention that the ALJ failed to

16   reference or discuss any corroborating statements of her boyfriend or friend is an inaccurate

17   characterization of the record because (1) the ALJ did discuss and accept the lay witness

18   testimony and (2) neither of those lay witnesses competently testified as to plaintiff's abilities in

19   the workplace.

20         C.    The ALJ Was Not Required to Use A Vocational Expert at Step Five.

21            Finally, plaintiff argues that the ALJ erred by not using the services of a

22   vocational expert to determine whether plaintiff could perform other jobs that exist in substantial

23   numbers in the national economy.  (Pl.'s Mot. for Summ. J. at 30 (citing Bruton v. Massanari,

24   268 F.3d 824, 828 (9th Cir. 2001)).)  Plaintiff contends that the ALJ may not rely solely on the

25   Commissioner's Medical-Vocational Guidelines, 20 C.F.R. Pt. 404, Subpt. P, App. 2 (the

26   "GRIDS") to show the availability of other jobs if the GRIDS do not accurately describe a

1   claimant's limitations.  (Pl.'s Mot. for Summ. J. at 30 (citing Burkhart v. Bowen, 856 F.2d 1335,

2   1340 (9th Cir. 1988)).)

3           The Commissioner counters that the ALJ may, but is not required to, use a

4   vocational expert at step five and that the seizures precautions that the ALJ imposed did not

5   significantly erode the unskilled occupational base at any exertional level, and thus the ALJ was

6   not required to obtain the opinion of a Vocational Expert.  (Def.'s Opp'n & Cross-Motion for

7   Summ. J. at 16 (citing Social Security Ruling ("SSR") 85-15).)

8           At step five of the sequential disability evaluation, the Commissioner bears the

9   burden of proving that the claimant can perform other jobs that exist in substantial numbers in

10  the national economy.  Bruton v. Massanari, 268 F.3d 824, 828 n.1 (9th Cir. 2001).  This burden,

11  as plaintiff recognizes, can be met in one of two ways: (1) by the testimony of a vocational

12  expert; or (2) by reference to the GRIDS.  Id.  Here, the ALJ used the GRIDS.

13          The GRIDS are in table form.  The tables present various combinations of factors

14  the ALJ must consider in determining whether other work is available.  See generally Desrosiers

15  v. Sec'y of Health & Hum. Svcs., 846 F.2d 573, 577-78 (9th Cir. 1988). The factors include

16  residual functional capacity, age, education, and work experience.  For each combination, the

17  GRIDS direct a finding of either "disabled" or "not disabled."

18          There are limits on using the GRIDS, an administrative tool to resolve individual

19  claims that fall into standardized patterns:  "[T]he ALJ may apply [the GRIDS] in lieu of taking

20  the testimony of a vocational expert only when the GRIDS accurately and completely describe

21  the claimant's abilities and limitations."  Jones v. Heckler, 760 F.2d 993, 998 (9th Cir. 1985); see

22  also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983).  The ALJ may rely on the GRIDS,

23  however, even when a claimant has combined exertional and nonexertional limitations, if

24  nonexertional limitations are not so significant as to impact the claimant's exertional

25

26

1  capabilities.[12]  Bates v. Sullivan, 894 F.2d 1059, 1063 (9th Cir. 1990), overruled on other

2  grounds, Bunnell v. Sullivan, 947 F.2d 341 (9th Cir. 1991) (en banc); Polny v. Bowen, 864 F.2d

3  661, 663-64 (9th Cir. 1988); see also Odle v. Heckler, 707 F.2d 439, 440 (9th Cir. 1983)

4  (requiring significant limitation on exertional capabilities in order to depart from the GRIDS).

5           Plaintiff argues that the because plaintiff's "impairments resulted in nonexertional

6  limitations, including manipulative limitations," that use of the GRIDS was insufficient and

7  testimony of a vocation expert was required.  (Dkt. No. 19 at 31.)  The ALJ found that plaintiff

8  retained sufficient capabilities, exertional or otherwise, to perform the full range of medium

9  work, save for the seizure precautions.  See Hoopai v. Astrue, 499 F.3d 1071, 1075 (9th Cir.

10 2007) (affirming the ALJ and holding that the claimant's depression was not a sufficiently severe

11 non-exertional limitation that required the assistance of a vocational expert).

12          None of the precedent cited by plaintiff supports her proposition that a vocational

13 expert is expressly mandated in the instant case because of plaintiff's collective nonexertional

14 limitations.  The ALJ, in determining whether plaintiff could make a successful adjustment to

15 other work, considered the SSRs relevant to this determination.  He recognized that the GRIDS

16 may be used as a framework for decisionmaking even where a claimant has exertional and

17 nonexertional limitations.  (See AT 22 (citing, inter alia, SSRs 83-12, 83-14, and 83-15).)[13]  The

18 ALJ found that plaintiff's limitations had little or no effect on the occupational base of unskilled

19 medium work.  (AT 22.)  Plaintiff's argument requiring the use of a vocational expert in these

20

21          [12]  Exertional capabilities are the "primary strength activities" of sitting, standing,
   walking, lifting, carrying, pushing, or pulling.  20 C.F.R. § 416.969a (b) (2003); SSR 83-10,
22 Glossary; compare Cooper v. Sullivan, 880 F.2d 1152, 1155 n. 6 (9th Cir.1989).

23          Non-exertional activities include mental, sensory, postural, manipulative and
   environmental matters that do not directly affect the primary strength activities.  20 C.F.R. §
24 416.969a(c) (2003); SSR 83-10, Glossary; Cooper, 880 F.2d at 1155 & n. 7 (citing 20 C.F.R. pt.
   404, subpt. P, app. 2, § 200.00(e)).

25
          [13]  SSR 85-15 provides the ALJ with clarification of how the GRIDS may be used as a
26 framework for evaluating solely nonexertional impairments.

1  circumstances is unpersuasive.  <u>Kerry v. Apfel</u>, 242 F.3d 382 (9th Cir. 2000) (recognizing that an

2  alleged non-exertional limitation does not automatically preclude application of the GRIDS, and

3  that the ALJ should first determine if a claimant's non-exertional limitations significantly limit

4  the range of work permitted by his exertional limitations); <u>Young v. Sullivan</u>, 911 F.2d 180, 185

5  (9th Cir.1990) (permissible for ALJ to rely on the GRIDS as a framework for decision making).

6          Plaintiff has not adequately and specifically argued which of plaintiff's alleged

7  non-exertional limitations significantly limited the range of work that she could perform.  Nor

8  does plaintiff cite to the procedures or evidence actually and allegedly erroneously used by the

9  ALJ in applying the GRIDS.  Accordingly, plaintiff has not demonstrated that the ALJ erred by

10  not consulting with a vocational expert.

11  V.    <u>CONCLUSION</u>

12          Based on the foregoing, IT IS HEREBY ORDERED that:

13          1.      Plaintiff's motion for summary judgment or remand is denied;

14          2.      The Commissioner's cross-motion for summary judgment is granted; and

15          3.      Judgment be entered in favor of the Commissioner.

16  DATED:  May 21, 2010

17

18

19                                          _____
                                            KENDALL J. NEWMAN
20                                          UNITED STATES MAGISTRATE JUDGE

21

22

23

24

25

26